*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-AA-0665

KEVIN V. REYNOLDS, PETITIONER,

v.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

CANON BUSINESS SOLUTIONS, INTERVENOR,

and

BROADSPIRE INSURANCE CO., INTERVENOR.

Petition for Review from a Final Order of the
Compensation Review Board of the District of Columbia
Department of Employment Services
(CRB-47-11)

(Submitted December 11, 2013                        Decided March 20, 2014)

*Benjamin T. Boscolo* for petitioner.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, and *Tonya A. Sapp*, General Counsel of the Department of Employment Services, filed a statement in lieu of brief in support of respondent's decision.

*Barry D. Bernstein* for intervenors.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*:  Petitioner, Kevin V. Reynolds, petitions this court to review the April 18, 2012, Order of the Compensation Review Board ("CRB") of the District of Columbia Department of Employment Services.  The CRB affirmed the Compensation Order issued by the Office of Hearings and Adjudication ("OHA") on April 14, 2011, that determined that petitioner's use of narcotic pain medication after July 1, 2009, was not "reasonable and necessary" and therefore the employer was not required to pay for it under D.C. Code § 32-1507 (2012 Repl.).  For the reasons stated below, we conclude that the CRB's order is not supported by substantial evidence in the record.  We, therefore, reverse and remand the case to the agency.

## FACTUAL SUMMARY

On June 29, 2004, the Office of Worker's Compensation awarded petitioner temporary total disability benefits to start retroactively, from March 20, 2002, and continuing for medical bills and ongoing medical treatment related to a work injury sustained on March 4, 2002, when petitioner injured his back while at work lifting a box.  Thereafter, in 2010, petitioner's employer, Canon Business Solutions, petitioned OHA seeking a modification of petitioner's total disability benefits due to a claimed change of condition.  The employer presented medical records in

support of its claim, including an independent medical exam (IME) report by Dr. Peter Esponnette dated May 16, 2007. Dr. Esponnette's IME report initially placed restrictions on petitioner's activities. However, after reviewing the written records of private investigators who had viewed surveillance footage taken earlier that year of petitioner while performing various activities,[1] Dr. Esponnette amended his IME report on June 13, 2007, and opined that the restrictions were inappropriate because there were "considerable differences between what petitioner claims he can do and what he actually does."

On February 24, 2010, the Administrative Law Judge (ALJ), Nata K. Brown, denied the employer's request for modification of the award, finding that the employer had not shown there had been a change of condition warranting the termination of petitioner's disability benefits. The ALJ discredited Dr. Peter Esponnette's IME report explaining that:

---

[1] As reported by the investigators, petitioner was placed under surveillance for eight hours each day on April 27, 2007, and April 28, 2007. During that time, petitioner was seen engaging in various outdoor activities "for less than one hour." Subsequently, petitioner was again placed under surveillance, for four-to-seven hours each day on August 20, 21, and 22, of 2008. According to the investigator's reports, the surveillance revealed that petitioner was "operating a hand-held rototiller, raking his yard, pounding stakes into the ground, tying rope to the stakes, moving a car from his driveway, taking wood out of a pick-up truck, riding a riding mower, driving his truck with a large screen TV in the back, and going to the gym."

> [The doctor] based his findings on assumptions from second-hand information; he never saw the video tape, nor did he mention the short amount of time that Claimant devoted to each recorded task . . . . Dr. Esponnette further opined that a functional capacity evaluation (hereinafter, FCE) was required. Without a recent FCE, Claimant's current physical capabilities are not known to Dr. Esponnette.

On March 16, 2011, the OHA held a formal hearing on petitioner's request for authorization of medical treatment, payment of medical bills, and reimbursement of out-of-pocket expenses, with interest, for treatment of depression and pain medication he claimed were causally related to the chronic pain from the back injury he sustained in 2002. In a Compensation Order dated April 14, 2011, the ALJ (Gerald D. Roberson) found that while treatment for petitioner's depression was causally related to his chronic back pain, the use of narcotic pain medication after July 1, 2009, was not reasonable and necessary. Therefore, the employer was obligated to pay only for narcotic medications prescribed and filled between August 20, 2007, and June 17, 2009.[2] In arriving at this conclusion, the ALJ relied on a Utilization Review (UR) report, which the employer had requested

---

[2] The ALJ affirmed the employer's responsibility to reimburse for other non-narcotic medications, Cymbalta and Effexor, being used to treat petitioner's depression and chronic pain.

on June 22, 2009, from Dr. William Abraham, for the purpose of certifying whether petitioner's ongoing treatment was reasonable and medically necessary.

The UR report recommended discontinuing petitioner's narcotic pain medication, based on the 2007 IME report of Dr. Esponnette. The UR report reasoned as follows:

> Dr. Esponnette noted his report needed amended [sic] to note the excessive reports of disability and symptom magnification. There were no recent records for this individual who apparently underwent lumbar surgery in 1997 and had been diagnosed with postlaminectomy syndrome. The most recent records, from 2007, suggest that perhaps no treatment is indicated in this particular case, as this individual appeared to be quite active, at least as suggested by the investigative report. To the extent this individual may be unfairly representing his ongoing disability, it is unclear that there would be any indication for anything other than p.r.n.[3] treatment. There would certainly be no indication for imaging studies and/or surgical intervention. If this gentleman is continuing to require narcotic pain medications, it would appear reasonable to recommend their discontinuation in a medically appropriate fashion.

---

[3] The term "p.r.n." stands for "pro re nata," or on an as-needed basis rather than at regularly scheduled intervals.

Petitioner appealed to the CRB, claiming that insofar as the 2009 UR report was based on the 2007 IME report that ALJ Brown had discredited in the February 24, 2010, Compensation Order, ALJ Roberson's 2011 Compensation Order erred in relying on the UR report to conclude that the continuation of narcotic pain medication was not reasonable and necessary. On April 18, 2012, the CRB affirmed ALJ Roberson's Order. The CRB concluded there was no error in the ALJ's reliance on the UR report because the ALJ had noted that the IME report had been discredited only with respect to its discussion on the nature and extent of petitioner's disability, which did not prevent the ALJ from relying on the UR report, along with other medical records, on the separate issue of the reasonableness and necessity of continuing the use of narcotics.

On appeal to the CRB, Petitioner also asserted that it was error for the ALJ to substitute his judgment for that of medical professionals by giving a date certain for the termination of employer payment for narcotic pain medication. The CRB concluded that there was no error because the ALJ's finding did not prevent petitioner from seeking narcotic pain medication; instead it relieved his employer from its obligation to continue reimbursing petitioner for its cost. Petitioner appeals the CRB's Order.

**I.**

We review administrative determinations under a well-established deferential standard. *See, e.g.*, *Washington Metro Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 926 A.2d 140, 146-47 (D.C. 2007). "We must determine first, whether the agency has made a finding of fact on each material contested issue of fact; second, whether the agency's findings are supported by substantial evidence on the record as a whole; and third, whether the Board's conclusions flow rationally from those findings and comport with the applicable law." *Id.* (quoting *Mills v. District of Columbia Dep't of Emp't Servs.*, 838 A.2d 325, 327 (D.C. 2003)). The CRB reviews Compensation Orders to determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether the legal conclusions drawn from those facts are in accordance with applicable law. D.C. Code § 32-1521.01 (d)(2)(A) (2005); *see Marriott Int'l v. District of Columbia Dep't of Emp't Servs.*, 834 A.2d 882, 885-86 (D.C. 2003). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Washington Metro Area Transit Auth.*, 926 A.2d at 147 (quoting *Ferreira v. District of Columbia Dep't of Emp't Servs.*, 667 A.2d 310, 312 (D.C. 1995)). "[W]e review the decision of the [CRB], not that of the ALJ . . . however, we cannot ignore the compensation order

which is the subject of the [CRB's] review.'" *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1280 (D.C. 2010) (quoting *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C. 2007)).

## II.

We conclude that the CRB's order does not satisfy these standards in various respects. Petitioner's first claim is that the CRB erred by affirming the April 14, 2011, Compensation Order because it relied on Dr. Abraham's 2009 UR report which, in turn, was based on Dr. Esponnette's 2007 IME report that was later (in 2010) discredited by ALJ Brown. The CRB examined ALJ Roberson's analysis and concluded the ALJ had not erred in relying on the UR report because (1) the IME was discredited only on the issue of the extent and nature of petitioner's disability, rather than the issue of reasonableness and necessity of petitioner's narcotic pain medication, and (2) the IME was not the only medical record the UR had relied on.

We cannot agree with the CRB's conclusion. ALJ Brown rejected Dr. Esponnette's IME report on the nature and extent of petitioner's physical capabilities in 2007, because it was based on second-hand observations by private

investigators and lacked information from a current functional capacity evaluation. Although the question of the need for narcotics pain medication was not before Dr. Esponnette in 2007, the 2009 UR report prepared by Dr. Abraham reached the conclusion that no narcotics pain medication was required based on the assumption that petitioner was in fact capable of performing the activities reported by the private investigators.[4] That assumption is relevant only as a basis from which to draw the further inference that if petitioner is able to engage in the type of activities reported by the private investigators, he must not be in such pain as to require narcotics for pain management. Subsequent to Dr. Abraham's UR report, however, ALJ Brown concluded in 2010 that the private investigators' report could not substitute for a medical doctor's own observations and a current evaluation of the petitioner. If there was no reliable current evidence of the petitioner's activities in 2010 when ALJ Brown dismissed Dr. Esponnette's IME report, that evidence was even less reliable and more out-of-date in 2011, when ALJ Roberson considered Dr. Abraham's UR report. Thus, insofar as ALJ Roberson's 2010 Compensation Order relied on the UR report, that reliance was fatally undermined

---

[4] The UR report's language in this respect could not be clearer. Referring to the 2007 IME report as the "most recent" record, the UR report noted: ". . . this individual appeared to be quite active, *at least as suggested by the investigative report. To the extent that this individual may be unfairly representing his ongoing disability*, it is unclear that there would be any indication for anything other than p.r.n. treatment . . . ." (emphasis added).

by ALJ Brown's 2010 Compensation Order. Moreover, as we discuss below, there is no support in the record for the CRB's assertion that the ALJ properly relied on "other records," in addition to the UR report, to conclude that narcotics medication was no longer necessary and reasonable.

There is also a fundamental analytic problem with the CRB's order affirming ALJ Roberson's Compensation Order. The CRB concluded that the Compensation Order was supported by substantial evidence, after it examined the ALJ's reasoning and found that it comported with the standards the CRB has stated the ALJ must apply to resolve disputes when the UR process is invoked:[5]

---

[5] The CRB has interpreted the UR statute as requiring that the ALJ must evaluate the opinion of the medical provider and the UR report on an equal footing and must articulate the reasons for choosing one opinion over the other. As the CRB has explained:

> [The] framework [requiring an explanation for rejecting a UR report] set forth by the court in *Sibley* [*Mem. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 711 A.2d 105, 107 (D.C. 1998),] is substantially identical to that espoused by the court in the treating physician cases, [*see, e.g., Short v. District of Columbia Dep't of Emp't Servs.*,] 723 A.2d 849 (D.C. 1998), and we view it as the appropriate manner to treat UR opinion under the Act. While it can be argued that the Act could be viewed so as to grant an even higher preference to UR opinion over treating physician opinion, we note that the processes envisioned by the statutory UR provisions call for

(continued . . .)

> The ALJ has taken into consideration the competing medical evidence and determined that the UR report is more persuasive . . . . he has reviewed and weighed the competing medical opinions and explained why he chose the UR report without giving any opinion an initial preference in keeping with the current state of the law in this jurisdiction.

The Board misapprehended the ALJ's analysis. In this case, the ALJ did not — as the CRB thought — give precedence to the UR report. Rather, the ALJ concluded that there was no conflict between the UR report and the treating physician's opinion. In reaching that conclusion, the ALJ made two findings, neither of which is supported by the record. The ALJ first noted that the records of the treating physician, Dr. Keniston-Dubocq, "did not reveal whether she had an

_____

(. . . continued)

> consideration of treating physician opinion and UR opinion, without specifying any preference for one or the other by virtue of its being treating physician opinion on the one hand, and UR opinion on the other. Accordingly, we view the statute as placing an obligation upon the ALJ to weigh the competing opinions based upon the record as a whole, and to explain why the ALJ chose one opinion and not the other, but does not require that either opinion be given an initial preference.

*Haregewoin v. Loews Washington Hotel and Liberty Mutual Insurance Co.*, CRB No. 08-068, 2008 WL 788313, at *3 (Feb. 19, 2008).

This court has referred to the CRB's interpretation, but has not adopted or rejected it. *See Children's Nat'l Med. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 403, 410 n.11 (D.C. 2010). It is not raised in this case, and we do not address it.

opinion regarding the reasonable[ness] and necessity of continuing the narcotic medication," in this case, fentanyl patches.[6] The ALJ also stated that Dr. Keniston-Dubocq's treatment recommendations were consistent with the findings of the UR report because she had "attempted to wean [petitioner] off the narcotics."

The records do not support that Dr. Keniston-Dubocq had implemented a narcotics pain medication discontinuation program. Although her entry for August 26, 2009, states that "we will, in the future, try to wean [petitioner] off the [narcotics] patches," as of as May 21, 2010, she was still recommending that petitioner "continue to use the [narcotic] fentanyl patches," and on July 7, 2010, her notes indicate that petitioner reported that the patch "continues to be very helpful" for his chronic pain.[7] The UR report, issued in 2009, could not have taken note of, and was inconsistent with, the treating physician's later notes. The ALJ also erred in stating that Dr. Keniston-Dubocq had not expressed an opinion on the reasonableness and necessity of petitioner's narcotic medication. Although there is no explicit statement from Dr. Keniston-Dubocq to that effect, absent clear

---

[6] Fentanyl is an opiate narcotic listed by the Drug Enforcement Administration as a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12 (c)(9) (2012).

[7] At that visit, Dr. Keniston-Dubocq increased the dosage of Cymbalta, a non-narcotic pain medication.

evidence to the contrary, it is logical to conclude that a doctor's continued prescription of medication, especially narcotics, is an implicit statement that the doctor believes it is reasonable and necessary for treating the patient.

These flawed findings led the ALJ to conclude that Dr. Keniston-Dubocq's medical records "appear to be consistent with the findings of the [UR] report." The UR report recommended in 2009 that "[i]f this gentleman is continuing to require narcotic pain medications, it would appear reasonable to recommend their discontinuation in a medically appropriate fashion," whereas Dr. Keniston-Dubocq's 2010 medical notes reflect continuation of narcotics pain medication. We do not know how the ALJ would have resolved this discrepancy between the medical opinions presented.

There is a further finding in the Compensation Order that, we conclude, is not supported by the record, even if the ALJ had provided (or were, on remand, to provide) an explanation for choosing between competing medical evidence. The Compensation Order determined that petitioner's "narcotic pain medications should have been discontinued effective July 1, 2009."[8] Petitioner asserts that the

---

[8] As the CRB pointed out, the ALJ could not set a termination date for petitioner's use of narcotic pain medication per se, but rather a date by which the

(continued . . .)

ALJ substituted his judgment for that of the medical professionals by fixing a date for the termination of narcotic pain medication. We agree. The July 1, 2009, UR report recommended "discontinuation in a medically appropriate fashion," not immediate cessation. This is consistent with Dr. Keniston-Dubocq's notation that any future discontinuation would entail a "weaning" process. ALJ Roberson saw no inconsistency between these opinions. When issuing the Compensation Order in 2011, however, ALJ Roberson set the reimbursement termination date for narcotics medication retroactively to July 1, 2009, when there was no medical support that abrupt termination of narcotics on a date certain was medically appropriate. In light of these flaws in the CRB's analysis and lack of substantial evidence to support the ALJ's findings, we reverse the CRB's order and remand the case to the agency.

## III.

Petitioner claims that the ALJ's and CRB's uncritical acceptance of the UR report in this case illustrates that the statutory UR mechanism is generally being misused to terminate the responsibility of employers and insurers to provide

_____

(. . . continued)
employer would no longer be legally obligated to reimburse petitioner for the cost of any narcotic pain medication because it was no longer deemed to be reasonable and necessary.

medical benefits for work-related conditions, shifting this cost to D.C. taxpayers. Petitioner's contention about systemic misuse of the UR mechanism is not a claim for which relief can be granted in his individual case. Especially in an area where the legislature has enacted a comprehensive scheme for worker's compensation, it is primarily for lawmakers to craft laws that balance competing interests and embody the public policy of the state.

We note that there are various safeguards in place to prevent abuse of the UR mechanism. Utilization reviews are available to any party seeking a third-party opinion on the "necessity, character, or sufficiency" of medical care or service. D.C. Code § 32-1507 (b)(6)(B) ("When it appears that the necessity, character, or sufficiency of medical care or service to an employee is improper or that medical care or service scheduled to be furnished must be clarified, the Mayor, employee, or employer may initiate review by a utilization review organization or individual."). This can be done before, during, or after medical treatment. *See* D.C. Code § 32-1507 (b)(6). The medical provider who recommended or recommends the challenged care has "the right to request reconsideration" of the UR report. D.C. Code § 32-1507 (b)(6)(C). The UR report is not dispositive; disagreements between a UR report and a medical care provider are submitted to the Mayor (*i.e.*, D.C. Department of Employment Services) for resolution. *See*

D.C. Code § 32-1507 (b)(6)(D).[9] As the UR process is being implemented by the CRB, when a UR report is submitted, the ALJ must evaluate it by taking into account the medical service provider's opinion, and must articulate a reason for choosing one opinion over the other. See *supra* note 5. The ALJ's determination is subject to administrative appeal to the CRB. The CRB's decision, in turn, is subject to judicial review. *See* D.C. Code § 32-1507 (b)(6)(D). In this case, these safeguards have been effective.

In light of the UR report's reliance on a discredited IME report and the discrepancy between the UR report and the treating doctor's medical records we have discussed *supra*, the ALJ's analysis was flawed. The ALJ further erred in setting the reimbursement termination date retroactively to July 1, 2009, without any support in the record. The CRB erred, therefore, in affirming the ALJ's Compensation Order.

---

[9] It appears that petitioner's treating physician did not request reconsideration of the UR report. The CRB has interpreted D.C. Code § 32-1507(b)(6)(D) as making the UR process mandatory where there is a dispute about the reasonableness and necessity of medical care. *See Children's Nat'l Medical Ctr.*, 992 A.2d at 410 (assuming, without deciding, that UR process is mandatory (citing *Gonzalez v. UNICCO Serv. Co.*, CRB No. 07-005, 2007 WL 867067, at *13 (Feb. 21, 2007))). A request for reconsideration of the UR report, however, is not required before a dispute may be submitted to DOES. *See id.* at 412 (accepting CRB's interpretation as reasonable (citing *McCormick v. Children's Nat'l Med. Ctr.*, CRB No. 09-016, 2009 WL 345799, at *5 (Jan. 2, 2009))).

Accordingly, we reverse and remand the case for re-examination of the medical evidence and findings and conclusions consistent with established legal principles.

*So ordered.*